MARTHA P. MOORE et al.

*v.*

DAVID H. RIDDLE et al.

[Submitted May 20th, 1913.    Decided June 9th, 1913.]

1. Complainant conveyed land to R., who agreed to find a purchaser for complainant's property, under an arrangement with R. that the title should be placed in his name so that he could mislead an alleged friend of R. into believing that R. owned the property, so as to in that way enable R. to borrow money from his friend to purchase from complainant, or, as complainant also testified, so as to enable R. to sell to such friend for complainant's price, and the deeds were recorded, and R. sold the property to defendant, an innocent purchaser, and did not pay complainant the price according to his agreement to do so or return the deed within a week, but complainant waited three months after conveying to R. before taking any action.—*Held*, that complainant was estopped as -against defendant from claiming that the deeds to R. were void.

2. A seal is essential to a deed.

3. Under a deed reciting that grantor "set her hand and seal the day and year first above written," it is presumed that a seal was affixed when the deed was executed.

4. Evidence, in a suit to set aside a deed as obtained by fraud, *held* not to show that the deed was not sealed when signed by complainant.

5. Delivery is essential to the validity of a deed.

6. Acceptance of a deed by grantee is essential.

7. A certificate of acknowledgment is not essential, as between the parties, to the validity of a deed of a *feme sole;* the purpose of such certificate being to supply evidence of the due execution of the deed and to enable it to be recorded.

On bill, answers and proofs.

*Messrs. Smith & Turner,* for the complainants.

*Mr. Charles E. Cook, Mr. Andrew J. C. Stokes, Mr. Alfred B. Cosey, Messrs. Melosh & Morten,* for the defendants.

BACKES, V. C.

The complainant was the owner of two tracts of land in North Brighton, near Spring Lake, Monmouth county. One was a vacant lot on Ocean avenue, the other an unoccupied cottage built on two lots on Worthington avenue. Three conveyances of these lands made by the complainant to Carrie H. Riddle are of record in the Monmouth county clerk's office; the first, dated May 3d, recorded May 4th, conveys so much of the vacant lot as lies west of Ocean avenue; the second, dated May 3d, recorded May 14th, conveys the remainder of this lot, known as the "bluffs;" the third, dated May 21st, recorded May 23d, conveys the cottage and lots. The certificates of acknowledgment bear the date of the deeds, and were made by one Housel, a commissioner of deeds. May 9th, Carrie H. Riddle and husband gave a mortgage to Charles D. Schanck for $1,250 on the land described in the first deed, and on July 27th following conveyed it and the "bluffs" lot to Andrew J. C. Stokes. May 28th the Riddles mortgaged the cottage and lots to D. Craig Bowne to secure $1,500, and on July 1st conveyed the equity to Charles W. and Kate Pastorfield. The Pastorfields on the same day mortgaged this property to Elizabeth Gleason for $1,400, and to Carrie H. Riddle for $300. The mortgages and deeds were promptly recorded. The bill is filed to set aside these conveyances and mortgages on the ground that the deeds to Carrie H. Riddle were obtained by fraud practiced on the complainant by David H. Riddle, the grantee's husband. The defendants, with the exception of the Riddles, are all innocent purchasers for value. The circumstances attending the making of the deeds to Carrie H. Riddle exhibit remarkable gullibility on the part of the complainant. She was anxious to sell her realty. David H. Riddle, a stranger, at first tendered his services as a selling

agent. Later he told her he had found a man—a New York friend—who would lend him the money to buy it, and suggested that she sell to him. To this she readily assented, fixing the price at $3,500 for the vacant lot and $4,200 for the cottage and lots. She gave him her title deeds, from which he drafted, on printed legal forms, the three deeds to Carrie H. Riddle, which she signed and handed to him. He placed them of record. The complainant is somewhat confused in her testimony regarding the inducement held out to her by Riddle to obtain her signatures. She, in one version, states that she was persuaded to hand over her muniments of title and to execute and deliver the deeds, by his fanciful tale that the New York friend was reluctant to part with his money because of his doubts of the values of the properties at the prices fixed by the complainant, and that the myth might be stimulated into lending him the money, if it were made to appear that he, Riddle, had bought the property at complainant's figures. The other is, that by these same tokens the "friend" would be persuaded to purchase. It is difficult to understand which of these representations, or if both, were held out to her. She says she was deluded into making the deeds for the vacant lot on May 3d, and notwithstanding Riddle's promise at that time to pay the consideration price within one week or to return to her the deeds, and his failure to make good his promise, she, eighteen days afterwards, relying upon like representations, signed the deeds for the cottage and lots. From other testimony given by the complainant, and circumstances in the case, it is inferable that she sold the property to Riddle, only deferring the day of payment until he in turn could make sale. At the time of these transactions Riddle gave to the complainant his promissory note for $5,500, payable in three months, and one thousand shares of capital stock in an oil company. These, she says, were given to her as a guarantee for the payment of the purchase price or a return of the deeds. About the same time she gave to Riddle two receipts dated May 21st and 28th, all in her handwriting, in which she acknowledged the payment of $1,000 and $1,500, respectively, and in the latter stated that it was for "payment on Spring Lake properties." To one Myers, a real estate agent in Spring Lake

who had charge of the renting of her cottages, she said she had sold it to Riddle. To a Mrs. Weinmiller, who intimated she understood the property had been sold to Riddle, she replied that she had not sold it to him because he had not as yet paid her the consideration price. Another circumstance is that Stokes, the purchaser of the vacant lot, discovered, in searching the title, that the "bluffs" had been omitted from the deed of May 3d, recorded May 4th, and requested Riddle to perfect the title. The deed of May 3d, recorded May 14th, resulted. Although the complainant is insistent that she signed the two deeds for the vacant lot at one time and the deed for the cottage at another, she manifestly is mistaken, because she admits that Riddle told her that he had searched the title and found that she had the riparian rights ("bluffs"), and that he asked her for the deed, which fits into the history as told by Stokes and also into the testimony of Housel, the commissioner, that upon three separate occasions he, at the request of Riddle, took the acknowledgments to the deeds.

The complainant has suffered a grievous wrong, but her predicament is due to her own folly and gross negligence while participating with her wrong-doer in an effort, as she supposed, to mislead and deceive the latter's New York friend. Whatever may have been the guile of Riddle, it is apparent that the complainant purposed clothing him with the *indicia* of ownership, with design that the "friend" should believe the title of the property to be in Riddle. Obsessed by this she cast aside precaution and, in disregard of the dictates of common prudence, signed and delivered to him what she knew to be deeds, the legal effect of which she undoubtedly fully comprehended, trusting to his assurance that they would not be binding, and would be returned if he were unsuccessful in borrowing money on their credit, or unable to make sale. She made it possible for Riddle to place the deeds of record and hold himself out to those who dealt with him as the rightful owner with power to sell and convey. The defendants—innocent purchasers—parted with their money, relying upon the representations of Riddle and the public records. Had the complainant exercised common sense and ordinary diligence even after the delivery of the deeds, she

could have protected herself against the conveyances and mortgages made in July. Riddle had promised to pay her the consideration price or return the deeds within a week after he got them, but she waited supinely for three months while he trafficked with the property. There is no principle of equity better settled nor more uniformly enforced than "whenever one of two innocent persons must suffer a loss by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." Or, as it is sometimes expressed, "that as between two persons equally innocent, a loss resulting from the fraudulent acts of another shall rest upon him by whose acts or omissions the fraud was made possible." Mr. Chief-Justice Holt puts it: "For, seeing that somebody must be the loser by this deceit, it is more reason that he who employed and put trust and confidence in the deceiver should be the loser than a stranger." *Halsted* v. *Colvin, 51 N. J. Eq. (6 Dick.) 387.* That the complainant intended to limit the operation of her duplicity to Riddle's supposed New York friend is irrelevant. *Horn* v. *Cole, 51 N. H. 287.*

The complainant, however, contends that the deeds were void *ab initio,* and that she comes within the exception to the rule of the application of the doctrine of estoppel (*Pom. Eq. Jur. (3d ed.) § 918*) because, as she asserts (*a*) her signature to the deeds was not, at the time of execution, attested by a seal; (*b*) the name of the grantee was erased and another substituted; or (*c*) the deeds were misread to her as to the name of the grantee; (*d*) there was no delivery and acceptance of the deeds; (*e*) they were not acknowledged by her. None of these, however, is supported, other than by the testimony of the complainant, except the last relating to the acknowledgments. To decree an annulment of deeds, to all appearances regular in form, and executed under circumstances as these are admitted to have been made, on the ground that they are void (not voidable), requires more than the uncorroborated and doubtful evidence of the complainant. She testified under great stress of self-preservation and without fear of contradiction. Riddle, it was stated at the hearing, is *non compos mentis.* That she unconsciously colored her story and related as facts matters which

were but impressions created by a sad retrospection, is apparent. An examination of her testimony demonstrates this.

A seal, of course, is essential to a deed. That it was affixed at the time of execution is presumed from the concluding words of the deeds, which recite that the grantor "set her hand and seal the day and year first above written." *Dev. Deeds* § 246. The complainant swears positively to the absence of seals, but I view her statement as speaking a conviction rather than recollection of the fact. One, at least, of the deeds bears a printed scroll over which is pasted a wafer, clearly indicating that she is in error. Besides, according to her story, she observed the deeds in the most casual manner at the time of signing. Her declaration that she would not have signed with a seal is the refrain of a bitter experience, and not descriptive of her earlier attitude, because it is evident that at the time she signed the deeds her confidence in Riddle was so firm that a seal would not have checked her course. The fact is, she was conscious the papers she was signing were deeds. She had previously transferred real estate and knew the requirements of deeds. And further, she intended that they should be regarded as deeds by the New York friend to whom they were to be shown. The testimony does not satisfy me that they were not executed under seal.

The claim that the name of Carrie H. Riddle as grantee was substituted for that of her husband, is refuted by the documents. The deeds are typewritten; the paper shows no traces of erasures, and counsel at the hearing conceded that his client's impressions were ill-founded.

It may have been, as the complainant testifies, that the grantee's name was misread to her by Riddle, he using his own name, but this could have been readily discovered had she exercised but ordinary diligence and observed before signing. She contented herself with reading only the latter portion of the deeds, and even had she done this with common care, it would have been disclosed, in the covenants of warranty, that Carrie H. Riddle was a party.

It is urged that there was neither delivery nor acceptance of the deeds, and consequently there was no divestiture of title.

Both are indispensable. *Rowley* v. *Bowyer, 75 N. J. Eq. (5 Buch.) 80; Skillman* v. *Skillman, 15 N. J. Eq. (2 McCart.) 388.* The deeds were, in fact, handed by the complainant to David H. Riddle. The conclusion at which I have arrived in disposing of the equities of these litigants makes it of little moment whether Carrie H. Riddle is to be regarded as the true or as an imposed grantee to and by whom, through the medium of her husband, the deeds were delivered and accepted.

That the deeds were not acknowledged by the complainant is affirmed by her, and in this she is corroborated by the certifying commissioner. His explanation is that upon three separate occasions he was called upon by Riddle to take the acknowledgments of the supposed grantor of the deeds in dispute. Each time the woman, whoever she was, simulated signing her name in his presence, although he did not actually see her write. She was represented, but not introduced, to him by Riddle, as Mrs. Moore, and upon her acknowledgment, made in response to Riddle's invitation, the commissioner formally certified. He was positive that the woman was not the complainant. He described her as of forty-five years, while the complainant is seventy. The witness is disinterested, and his credibility is unchallenged. That the complainant was impersonated by the procurement of Riddle, and the commissioner imposed upon, and that the certificates of acknowledgment are false, cannot be doubted. A certificate of acknowledgment is, however, not essential to the validity of a deed of a *feme sole,* and forms no part of it. Its purpose is twofold: to supply evidence of its due execution in lieu of direct proof, and to enable it to be recorded. To accomplish the latter the deeds could as well have been proved by Riddle as subscribing witness. Viewing them as falsely certified, they are a fraud upon the records, but their validity as between the parties and those holding under them, depends upon considerations wholly aside from this fraud.

The principle on which the complainant relies is illustrated in *Russell* v. *American Bell Telephone Co., 180 Mass. 467,* but I find nothing in the grounds assigned which relieves her of the penalty of her indiscretions. The complainant's conduct estops her from asserting her title as against the innocent pur-

chasers. The bill will be dismissed as to all the defendants except the Riddles. Carrie H. Riddle will be decreed to hold the $300 mortgage in trust for the complainant.

The Pastorfields answered, setting up their title as innocent purchasers, and at the hearing were represented by counsel, although they did not appear. Counsel declined to press the defence set up by their answer, but refused to withdraw it. The reason for this, as stated by counsel, was that the Pastorfields have pending in this court an action against the Riddles to set aside a conveyance given in exchange for the property involved in this suit. Success in that action depends upon the outcome of this litigation. I must, however, dispose of this case upon the pleadings and proofs before me. They show title in these defendants, and it is not denied that it was acquired innocently and for value. If counsel will give formal consent to that effect, I will advise that the deed to the Pastorfields be set aside. The defendants who are dismissed are entitled to costs.